UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MELVIN MARRERO RIVERA,              )
                                    )
        Plaintiff                   )
                                    )
        v.                          )    Case No. 15-cv-30002-KAR
                                    )
CAROLYN W. COLVIN,                  )
Acting Commissioner of Social       )
Security Administration             )
                                    )
        Defendant                   )

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR ORDER
REVERSING THE COMMISSIONER'S DECISION AND DEFENDANT'S MOTION TO
AFFIRM DECISION OF THE COMMISSIONER
(Dkt. Nos. 18 & 22)

ROBERTSON, U.S.M.J.

    I.    Introduction

        This is an action for judicial review of a final decision by the acting Commissioner of the

Social Security Administration ("Commissioner") regarding Plaintiff's entitlement to Social

Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits.  *See*

42 U.S.C. §§ 405(g) and 1383(c)(3).  Plaintiff Melvin Marrero Rivera ("Plaintiff") faults the

Commissioner's decision denying him such benefits – memorialized in a June 7, 2011 decision

by an administrative law judge ("ALJ") – because:  (1) the Commissioner accorded little weight

to Plaintiff's treating physician's opinion regarding Plaintiff's physical limitations; (2) the

Commissioner failed to appropriately consider Plaintiff's non-exertional impairments; and (3) the

Commissioner failed to give controlling weight to Plaintiff's mental health treatment providers'

opinions.  Plaintiff has moved to reverse the Commissioner's decision or, in the alternative, to

remand the decision (Dkt. No. 18), and the Commissioner, in turn, has moved to affirm (Dkt. No. 22).

The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the following reasons, the court will remand the case to the Commissioner for amplification of the reason for the denial of benefits for the period from June 3, 2011 until Plaintiff's surgery on October 16, 2012. The Commissioner's decision as to the subsequent period is affirmed.

## II.   Factual Background

Plaintiff was 36 years old at the time of the ALJ hearing on June 20, 2013 (Administrative Record ("A.R.") at 16, 39). He is a high school graduate, who previously was employed as a maintenance worker, security guard, and dishwasher (*id*. at 39, 40, 245). He worked as a supervisor for a produce distributor at his last job in 2008 (*id*. at 39-40). In his application for SSDI and SSI, Plaintiff alleged that he was disabled due to screws in his left leg and arthritis in his ankle (*id*. at 244).

## III.   Procedural Background

Previously, in 2009, Plaintiff had applied for SSI and SSDI (*id*. at 115). After a hearing on June 7, 2011, the ALJ in the prior case ("first ALJ") found Plaintiff to be disabled for a closed period -- from October 1, 2008 to June 2, 2011 -- due to the following severe impairments: status post left tibia/fibula fracture and implantation of hardware; obesity; and obstructive sleep apnea ("OSA") (*id*. at 23, 115-121).

Plaintiff made subsequent applications for SSDI and SSI on October 18, 2011, alleging an onset of disability on June 3, 2011 (*id*. at 16, 213, 220). The applications were denied initially and upon reconsideration (*id*. at 16, 71, 82, 95, 106). Following a hearing on June 20, 2013, the

ALJ issued a decision on August 14, 2013, finding that Plaintiff was not disabled and denying

Plaintiff's claims (*id*. at 16-26). The Appeals Counsel denied review (*id.* at 1-8). Thus, the ALJ's

decision became the final decision of the Commissioner. This appeal followed.

IV.   Discussion

A.   Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the final

decision of the Commissioner, with or without remanding for a rehearing. *See* 42 U.S.C. §

405(g). Judicial review "is limited to determining whether the ALJ used the proper legal

standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*,

211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo*, but must defer to

the ALJ's findings of fact if they are supported by substantial evidence. *See id*. (citing *Nguyen v.*

*Chater*, 172 F.3d 31, 35 (1st Cir. 1999)). Substantial evidence exists "'if a reasonable mind,

reviewing the evidence in the record as a whole, could accept it as adequate to support [the]

conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir.1991)

(quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)). In

applying the substantial evidence standard, the court must be mindful that it is the province of

the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence,

and draw conclusions from such evidence. *See id.* So long as the substantial evidence standard

is met, the ALJ's factual findings are conclusive even if the record "arguably could support a

different conclusion." *Id.* at 770. That said, the Commissioner may not ignore evidence,

misapply the law, or judge matters entrusted to experts. *See Nguyen*, 172 F.3d at 35.

B.   Standard for Entitlement to Social Security Disability Insurance and
        Supplemental Security Income

In order to qualify for SSDI, a claimant must demonstrate that he was disabled within the meaning of the Social Security Act (the "Act") prior to the expiration of his insured status for disability insurance benefits.  *See* 42 U.S.C. § 423(a)(1)(A) and (D).  SSI benefits, on the other hand, require a showing of both disability and financial need.  *See* 42 U.S.C. § 1381a. "Plaintiff's need, for purposes of SSI, and insured status, for purposes of SSDI, are not challenged.  The only question is whether the ALJ had substantial evidence with which to conclude that Plaintiff did not suffer from a disability."  *Bitsacos v. Barnhart*, 353 F. Supp. 2d 161, 165-66 (D. Mass. 2005).

The Act defines disability, in part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  *See also* 42 U.S.C. § 1382c(a)(3)(A) (similar).  An individual is considered disabled under the Act

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  *See generally Bowen v. Yuckert,* 482 U.S. 137, 146–49 (1987).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in regulations promulgated under the Act.  *See* 20 C.F.R. §§ 404.1520(a) and 416.920(a).  The hearing officer must determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in

Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id*; *see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  *See* 20 C.F.R. §§ 404.1520 and 416.920.

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can do other work.  *See id*.  "The RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling ("SSR") 96-8p, 1996 WL 374187, at *2 (July 2, 1996).  "Work-related mental activities generally . . . include the abilities to:  understand, carry out and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision and co-workers and work situations; and deal with changes in a routine work setting."  *Id*. at * 6.  Put another way, "[a]n individual's RFC is defined as 'the most you can still do despite your limitations.'"  *Dias v. Colvin*, 52 F. Supp. 3d 270, 278 (D. Mass. 2014) (quoting 20 C.F.R. § 416.945(a)(1)).

The claimant has the burden of proof through step four of the analysis.  At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding impairment(s).  *See Goodermote*, 690 F.2d at 7.

C.    Medical Records

1.    Physical condition

In support of the disabling conditions listed in Plaintiff's application for SSDI and SSI benefits, he presented the ALJ with extensive medical evidence spanning the period from 2010 through 2013, which included a portion of the closed period of disability from October 1, 2008 to June 2, 2011 (A.R. at 115, 121).  Plaintiff currently claims that he was disabled on June 3, 2011 (*id.* at 16, 213, 220).  As a result, the court focuses on the medical history that is related to Plaintiff's physical impairments as of that date.

a.    Left leg

Plaintiff complained of pain in his left knee, shin, and ankle due to the repair of fractures of his left tibia and fibula in 2004 by an open reduction internal fixation ("ORIF") surgical procedure, which involved the implantation of an intramedullary ("IM") rod and three screws (*id.* at 298, 305, 327).  The medical evidence shows that Plaintiff had some osteoarthritis, walked with an antalgic gait,[1] and occasionally used a cane, but generally maintained full range of motion in his knee and foot (*id.* at 303, 452, 465, 467, 471).

Plaintiff saw his primary care physician ("PCP"), Dr. Nao Sakurai, on June 30, 2011 (*id.* at 21, 316).  Plaintiff had fallen the day before when his left knee suddenly collapsed (*id.* at 316).  He reported "frequent numbness" in his left leg (*id.*).  He was instructed to keep a follow-up appointment at New England Orthopedic Surgeons ("NEOS") (*id.* at 318).

---

[1] "An antalgic gait suggests that a patient is walking in a certain manner in order to avoid pain." *Saenz v. Colvin*, 61 F. Supp. 3d 195, 198 n. 2 (D. Mass. 2014) (citing *Stedman's Medical Dictionary* 65 (25th ed. 1990)).

Physician's Assistant Hank Casagrande examined Plaintiff's left knee and shin at NEOS on August 5, 2011 (*id*. at 303).  Plaintiff complained of continued pain in his knee and leg with "intermittent feelings of constant achy pain throughout [his] knee, shin, and ankle" (*id*).  He had full range of motion of his left knee, foot, and ankle (*id.*).  An x-ray of Plaintiff's left knee showed "advancing medial compartment arthrosis," which was consistent with prior radiographs (*id*. at 303, 304).  Casagrande's impression was that Plaintiff suffered "[s]ymptomatic osteoarthropathy of the knee and retained hardware" (*id*. at 303).  Plaintiff received a steroid injection in his left knee for pain relief (*id.*).

On August 26, 2011, J. Stephen Brecht, M.D. of NEOS recorded that Plaintiff's x-rays revealed "a healed midshaft tibia fracture and fibula fracture," with "good alignment" and "no near ankle arthritis" (*id*. at 305, 306).  The screws were intact (*id.* at 305).  Dr. Brecht confirmed the diagnosis of "some early left knee osteoarthritis" (*id*.).  Despite Dr. Brecht's advisement that there was a fifty per-cent chance that Plaintiff's pain would improve after surgery to remove hardware, and, in fact, there was the potential for increased pain, Plaintiff opted to undergo surgery (*id.*).

In January 2012, Dr. Sakurai recorded that Plaintiff visited Puerto Rico from November 20, 2011 through January 13, 2012 (*id*. at 390).  Plaintiff was scheduled to have surgery to remove hardware from his left leg in January 2012, but first needed clearance from his cardiologist (*id.*).  Although physical therapy had been recommended, Plaintiff had not yet scheduled a session (*id.*).

On January 26, 2012, Dr. Brecht recorded that Plaintiff experienced tenderness over the two distal locking screws and the single proximal screw in his left leg (*id*. at 400).  Surgery to remove the locking screws was scheduled for March 7, 2012 (*id*. at 401, 403).  Plaintiff

complained that Dr. Sakurai would not prescribe narcotics, but Plaintiff did not appear to be in distress (*id.* at 400).

Dr. Sakurai conducted the pre-operative evaluation of Plaintiff on February 29, 2012 (*id.* at 387). Plaintiff did not have major cardiovascular risk factors, but had intermediate risk factors including diabetes, and minor risk factors due to "uncontrolled hypertension" (*id.* at 388). A recent nuclear stress test and EKG were normal (*id.* at 388, 409, 426-429). Plaintiff had pulmonary risk factors, including obesity and "probable" OSA (*id.* at 388). Plaintiff missed a sleep study, and there was a question whether it could be scheduled prior to surgery (*id.* at 388-389, 452).

In March 2012, Plaintiff was not in apparent distress during a visit to NEOS (*id.* at 405). Dr. Brecht advised Plaintiff that he preferred to have the results of the sleep study prior to surgery due to the potential for oversedation (*id.*). The sleep study was performed in June 2012 (*id.* at 430-438).

Dr. Sakurai's notes from Plaintiff's routine visit in April 2012 reflect the fact that Plaintiff had missed an appointment with the orthopedic surgeon, but intended to reschedule it (*id.* at 452, 453, 454). Plaintiff saw Dr. Sakurai in July 2012 for pain in his right heel (*id.* at 460). Plaintiff's "[g]ait [was] normal on both sides," and his extremities were "normal" (*id.*). His musculoskeletal evaluation was "[n]egative for decreased mobility, joint instability and weakness" (*id.* at 459). Dr. Sakurai performed a second preoperative evaluation on September 26, 2012 for Plaintiff's leg surgery, which was scheduled for October 2012 (*id.* at 462). Plaintiff's cardiac and pulmonary risk factors remained unchanged since the earlier pre-operative evaluation (*id.*). Dr. Brecht surgically removed the locking screws on October 16, 2012 in an effort to relieve Plaintiff's pain (*id.* at 476).

The examination notes of Plaintiff's post-operative office visit to Dr. Sakurai on March 18, 2013 show that Plaintiff's gait was antalgic, but "full weight bearing and no assistive device" (*id*. at 23, 467, 469).  Yet, Plaintiff complained that there was no "significant improvement" in the pain after surgery (*id.* at 467).  Plaintiff reported that his post-surgical pain was relieved by the Percocet that NEOS prescribed, but the prescription had run out and he was purchasing Percocet from his friends (*id*. at 467, 471).  Dr. Sakurai ordered a urine toxicology test prior to prescribing any pain medication (*id*. at 470).  Because Plaintiff's urine tested positive for cocaine, Dr. Sakurai would not prescribe opioids (*id*. at 442, 471).  Plaintiff was "upset" and "cursed" when he learned of the doctor's decision (*id*. at 471).

Dr. Brecht examined Plaintiff on March 21, 2013 due to Plaintiff's continued complaints of left leg pain (*id*. at 22, 476).  Plaintiff was not in apparent distress and did not require treatment with narcotics (*id*. at 476).  An x-ray of Plaintiff's left tibia revealed a well-healed fracture and a broken screw, which went from front to back on the distal end of the tibia, but Dr. Brecht opined that the screw and the tibial nail would not cause discomfort due to their locations (*id*. at 22, 476-77, 478).  Plaintiff's ankle and knee joints were unremarkable (*id*. at 476, 478).  Dr. Brecht noted that Plaintiff had good strength in his leg with no signs of instability (*id*. at 22, 476).  Dr. Brecht ordered an MRI of Plaintiff's left knee, which was performed on April 25, 2013 (*id*. at 22, 473, 477).  The MRI revealed an oblique tear in the posterior third of the medial meniscus (cartilage), but no other ligamentous injuries (*id*. at 22, 473-74, 479).  Plaintiff did not appear to be in distress due to the meniscal tear (*id*. at 479).  Dr. Brecht recommended arthroscopic treatment (*id*. at 479).

Because Plaintiff "kept coming to the clinic, requesting opioid analgesics," while Dr. Sakurai was on vacation, Dr. Sakurai discussed pain management with Plaintiff on April 18,

2013 (*id*. at 471).  Again, Plaintiff's urine screen was positive for cocaine (*id*. at 456, 508).

Plaintiff left the room when Dr. Sakurai reported the test results (*id*. at 456).  Dr. Sakurai would

not start chronic opioid treatment because Plaintiff received a "high" score on the opioid risk

assessment; that is, Plaintiff posed a high risk for opioid addiction (*id*. at 456).

On April 19, 2013, Plaintiff was treated in the Holyoke Medical Center emergency room

for pain in his left knee and ankle (*id*. at 506, 507).  Plaintiff was not in acute distress (*id*. at 507).

He was prescribed medication (*id*. at 507).  Plaintiff returned to the emergency room on May 15,

2013 with a similar complaint of pain in his left knee (*id*. at 504).  His gait was limited by pain,

but was not antalgic and he was able to bear weight (*id*. at 504, 505).  He received a prescription

for Percocet (*id.* at 505)

b.       Diabetes mellitus

Dr. Sakurai treated Plaintiff for diabetes mellitus, which was diagnosed in April 2011 (*id*.

at 316).  Initially, Plaintiff checked his glucose at least once a day (*id.*).  As of September 2011,

he had improved his diet, stopped drinking alcohol, and took prescribed medication (*id*. at 313).

In January 2012, Plaintiff's diabetes was "well controlled" (*id*. at 391).  Six months later in July

2012, Dr. Sakurai discussed "the importance of lifestyle modification and chronic disease

management" because Plaintiff's diabetes was "[u]ncontrolled" (*id*. at 460).  Plaintiff's diabetes

had improved in September 2012, and was "controlled" by March 2013 through monitoring his

blood glucose, improving his diet, and adhering to his prescribed medication (*id*. at 466, 467,

468, 470).

c.       Hypertension

Plaintiff was prescribed medication to treat his hypertension and was advised to alter his

lifestyle and to continue his medications (*id*. at 314, 327, 328, 454, 392, 460, 466, 470).  In

February 2012, his sinus rhythm was normal, his stress test was "completely normal with no evidence of myocardial ischemia with EF of 57%, which is consistent with EF on echocardiogram of 55 to 60% with no major valvular abnormalities" (*id.* at 409, 409, 413).  In March 2012, Plaintiff reported to Dr. Sakurai that his blood pressure was usually normal at home and at other medical offices, and in September 2012, Plaintiff's blood pressure was "usually within [an] acceptable range" (*id.* at 389, 462, 465).

d.      Obstructive sleep apnea

After a sleep study was conducted and a continuous positive air pressure ("CPAP")[2] machine was recommended, Plaintiff was diagnosed with "mild" OSA (*id.* at 430-31, 460, 466-67, 471).

2.      <u>Mental condition</u>

Because Plaintiff's 2009 application for benefits was not based on his mental condition, it appears from the record that the first ALJ did not consider Plaintiff's mental health records (*id.* at 115-120).  A summary of those records follows.

Plaintiff began treatment with a therapist, Irma Ramírez Mendez ("Ramírez"), at the City Clinic on June 9, 2009 after referral by his physician, but Plaintiff's treatment history was sporadic and he failed to consistently adhere to his medications (*id.* at 375).  Between June 2009 and February 2012, Plaintiff's Global Assessment of Functioning ("GAF") scores ranged from 50 to 60 (*id.* at 357-360, 362, 369, 378, 417).[3]  Plaintiff presented as depressed, sad, and irritable,

---

[2] "A CPAP machine delivers a constant air flow, or pressure, to users while they sleep, allowing for OSA treatment at home. *How is Sleep Apnea Treated?,* Nat'l Heart, Lung, and Blood Inst. http:// www.nhlbi.nih.gov/hea lth/health-topics/topics/sleepapnea/treatment.html (last accessed June 6, 2014)."  *Price v. Colvin*, Civil Action No. 4:13-CV-01322, 2014 WL 2611804, at *2 n. 3 (S.D. Tex. June 10, 2014).

[3] "GAF 'evaluates overall psychological functioning on a scale of 0–100 that takes into account "psychological, social, and occupational functioning."'"  *Tardiff v. Astrue*, No. 11-CV-17-JD,

and complained of insomnia (*id*. at 377).  Ms. Ramírez diagnosed Plaintiff with a mood disorder

due to a general medical condition (DSM-IV 293.83) (*id*. at 377).  Plaintiff ended his services

with City Clinic on June 29, 2010, but, then, saw Ms. Ramírez in October 2010, in March and

October 2011, and in February and December 2012 (*id*. at 352, 353, 357, 362, 369, 417, 421).

His diagnosis remained unchanged (*id*. at 352-53, 359-60).  Notes from October 2011 indicate

that Plaintiff was compliant with treatment, but had "several no shows" (*id*. at 355).

Although Dr. Sakurai prescribed medications to treat Plaintiff's depression and anxiety,

Plaintiff failed to adhere to a regular medication regimen (*id*. at 313, 319-20, 321, 327, 453).

Plaintiff denied hallucinations during a visit to City Clinic in October 2010, and hallucinations

were not noted in the other City Clinic records from November 2009 through December 2012

(*id*. at 352-356, 366-67, 371-74, 421).  On January 17, 2012, Plaintiff reported to Dr. Sakurai that

he was "seeing shadows," especially at night, but did not experience auditory hallucinations (*id*.

at 390, 392).  He was not taking the fluoxetine that Dr. Sakurai had prescribed in September

2011, but was taking trazodone (*id*. at 390).  Dr. Sakurai directed Plaintiff to continue taking

fluoxetine and trazodone, and added Risperidone (*id*. at 392).

On September 26, 2012, Plaintiff told Dr. Sakurai that he had not seen his therapist at

City Clinic "for a while" (*id*. at 462).  Dr. Sakurai's note on April 18, 2013 says:

> Because of [Plaintiff's] significant history of mental illness, he was asked to receive
> treatment/counseling.  He has told us that he was actively engaged in counseling with
> Irma [Ramírez], City Clinic psychotherapist.  However, we have received a report that his
> treatment was terminated due to no-shows.  His story is inconsistent with [Ramírez's]
> story, but [Plaintiff] still states he is seeing her soon.

---

2012 WL 777484, at *1, n. 2 (D.N.H. Mar. 7, 2012) (quoting *Washington v. Astrue,* Civil Action
No. 10-10416-DPW, 2011 WL 4407432, at *1, n. 3 (D. Mass. Sept. 20, 2011), quoting *American
Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. rev.
2000)).

(*id*. at 471).

        D.      RFC Assessments

            1.      State agency reviewers

On December 15, 2011, Erik Purins, M.D., a Disability Determination Services ("DDS") nonexamining medical consultant, assessed Plaintiff's RFC (*id*. at 70, 81).  In his assessment, Dr. Purins opined that Plaintiff could:  (1) occasionally lift and/or carry 20 pounds; (2) frequently lift and/or carry 10 pounds; (3) stand and/or walk, with normal breaks, for a total or four hours during an eight-hour workday with the assistance of a cane on uneven surfaces and for distances of more than 50 yards; (4) sit on a sustained basis, with normal breaks, for about six hours during an eight-hour workday; (5) push and/or pull with limitations for his lower left extremities; (6) occasionally climb ramps, stairs, ladders, ropes, and scaffolds; (7) occasionally kneel, crouch, and crawl; and (8) stoop and balance without limitation (*id.* at 68-69, 79-80).  Dr. Purins further opined that Plaintiff should avoid concentrated exposure to extreme cold and hazards, but had no other environmental limitations (*id*. at 69-70, 80-81).  On May 31, 2012, a second DDS consultant, Meghana C. Karande, M.D., affirmed Dr. Purins's opinions (*id*. at 90, 92-94, 101, 103-105).

The record also includes the results of a psychiatric review technique ("PRT") analysis[4] of Plaintiff's mental impairments, which was conducted by John Gambill, M.D. who completed a Psychiatric Review Technique Form ("PRTF") on December 15, 2011 (*id.* at 67-68, 77-78).  Dr. Gambill opined that Plaintiff's personality disorder, alcohol/substance addiction disorders, and

---

[4] "The [psychiatric] review technique is used to rate the severity of mental impairments at Steps Two and Three of the sequential evaluation process, and also serves as the backdrop for the more detailed mental RFC assessment at Step Four."  *Pelletier v. Colvin,* C.A. No. 13–651 ML, 2015 WL 247711, at *12 (D.R.I. Jan. 20, 2015) (citations omitted).

affective disorders were non-severe mental impairments (*id.* at 66-67, 77-78).  Dr. Gambill determined that Plaintiff's mental disorders imposed only mild restrictions on his activities of daily living, his ability to maintain social functioning, and his ability to maintain concentration, persistence or pace (*id*. at 67, 78).  He also stated that Plaintiff had not experienced repeated episodes of decompensation of extended duration (*id.* at 67, 78).[5]  On reconsideration on June 20, 2012, Lawrence Langer, Ph.D., indicated that Plaintiff's alleged mental impairments were non-severe, that "[n]o mental medically determinable impairments [were] established," and that Plaintiff did not respond to Dr. Langer's requests for additional information (*id.* at 91, 102).

### 2.   Dr. Sakurai

In the RFC questionnaire that Dr. Sakurai completed in June 2013, he diagnosed Plaintiff with "chronic" left leg pain, diabetes, hypertension, obesity, mood disorder, gastroesophageal reflux disease ("GERD"), OSA, and substance abuse (*id*. at 490).  Dr. Sakurai concluded that Plaintiff's ability to perform sustained work would be limited by the pain caused by prolonged walking and weight bearing and the need for frequent rest (*id.* at 491).  Dr. Sakurai indicated that Plaintiff could stand for up to four hours during an eight hour workday, could sit for eight hours without the need to take a break or change from a sitting position, could walk up to 500 feet with rest and an assistive device, could frequently lift a maximum of five pounds, and could occasionally lift ten pounds (*id*. at 492).  Plaintiff could occasionally twist, stoop, or climb stairs, but could never crouch, squat, or climb ladders (*id.*).  Plaintiff could use his hands for repetitive hand motions, and for pushing and pulling without restriction, but his ability to use his feet or

---

[5] "The four factors to which [Dr. Gambill] directed his opinion are the so-called 'paragraph B' criteria."  *Littlefield v. Colvin*, No. 14-CV-53-LM, 2015 WL 667641, at *3 n. 7 (D.N.H. Feb. 17, 2015).

legs for repetitive motions was limited (*id*. at 492-93).  According to Dr. Sakurai, Plaintiff's ability to cope with work stress would be impaired by his bipolar disorder, and poor impulse control (*id.* at 491).  Dr. Sakurai estimated that Plaintiff would be absent from work or have to leave work more than four times per month due to his impairments (*id.* at 493).

3.    <u>Irma Ramírez</u>

In a Mental Impairment Questionnaire, dated June 19, 2013, Ms. Ramírez diagnosed Plaintiff as having panic attacks with agoraphobia and depressive disorder (*id*. at 496, 501).  Ms. Ramírez assigned a GAF score of 55 at the time of the assessment, and stated that Plaintiff's highest GAF score during the past year was 50 (*id*.).  Ms. Ramírez indicated that Plaintiff had no useful ability to function in seven areas of mental abilities and aptitudes needed to do unskilled work, was unable to meet competitive standards in five areas, and had limited, but satisfactory, ability in only one area:  his ability to understand and remember very short instructions (*id*. at 498).  In the area of functional limitations (paragraph B criteria), Ms. Ramírez determined that Plaintiff had moderate restrictions in his activities of daily living, marked difficulties in maintaining social functioning, and extreme difficulties in maintaining concentration, persistence, or pace (*id*. at 500).  Plaintiff had experienced four or more episodes of decompensation within a twelve-month period, each of which lasted for at least two weeks (*id*.).  Ms. Ramírez's questionnaire concluded with two additional relevant opinions: (1) Plaintiff has an anxiety-related disorder and a complete inability to function outside his home; and (2) his impairment or treatment would cause him to be absent from work for more than four days per month, which is the highest degree of absenteeism listed on the questionnaire (*id*. at 500-01).  In sum, Ms. Ramírez opined that Plaintiff was unable to work (*id*. at 498-99).  He was, however, able to manage benefits in his own best interest (*id.* at 501).

15

E.     ALJ Hearing

Plaintiff and James Parker, an independent Vocational Expert ("VE") testified before the ALJ.  Plaintiff acknowledged that, at the prior ALJ hearing, he agreed that his disability ended on June 2, 2011 (*id*. at 41).  Although Plaintiff believed that surgery would alleviate the pain in his left leg, Plaintiff testified that one of the screws broke during surgery, and the removal of hardware did not alleviate the pain from his knee to his ankle (*id*. at 41-42, 43, 47).  He was not able to sleep due to the pain, despite taking sleeping pills (*id.* at 43).  On a scale of 1 to 10, Plaintiff testified that his pain was a "10" after the surgery (*id*. at 43, 47-48).  He indicated that NEOS would treat the torn meniscus in his left knee with cortisone (*id*. at 45-46).

According to Plaintiff, he saw his therapist, Ramírez, two to three times per month to treat his depression and anxiety (*id*. at 44-45).  Plaintiff testified that he spent his days in his room and did not do household chores (*id*. at 46-47, 48).  Although he travelled to Puerto Rico from November 20, 2011 until January 13, 2012 to help his mother sell her home, he testified that he did not leave the house while he was there, and did not take his medication because he did not want to deplete his entire supply (*id*. at 48, 50).

The ALJ asked the VE if there was any light work that a person with Plaintiff's age, education, and past work experience could perform given the following limitations:  standing and walking for four hours during an eight hour day; occasionally stooping, kneeling, crouching, crawling, climbing ramps, stairs, ropes, and scaffolds; using a cane to walk on uneven surfaces or more than 50 yards; avoiding concentrated exposure to hazardous conditions, such as unprotected heights and dangerous machinery; and lacking the ability to communicate in English (*id*. at 52-53).  The VE opined that, considering those limitations, there were light jobs, specifically bench or desk work, such as assembling small products, sorting and folding laundry,

and marking prices in a retail store, which were available in the United States and in the local area (*id*. at 54). In addition, the sedentary jobs that were available in the national economy and in the region were: inspecting tiles for defects; performing the final assembly for optical products; and polishing jewelry (*id*. at 53-54). The VE's opinion remained the same if the work was limited to simple, routine tasks with few workplace changes (*id*. at 55). Only the laundry sorter position had a sit-stand option (*id*. at 58-59). The VE indicated that an individual who missed three days of employment per month due to symptoms or treatment would be terminated from employment (*id*. at 56). Plaintiff's attorney asked the VE if any of these jobs would permit Plaintiff to take up to four unscheduled breaks of fifteen to twenty minutes per day and the VE responded that they would not (*id*. at 57, 59).

      F.     <u>ALJ's Decision</u>

Following the hearing on June 20, 2013, the ALJ denied Plaintiff's claim on August 14, 2013 (*id*. at 26). In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of June 3, 2011 (*id.* at 18). 20 C.F.R. §§ 404.1571 *et seq*., and 416.971 *et seq*. At step two, the ALJ found that Plaintiff was severely impaired due to obesity and the history of a prior fracture of his left tibia and fibula after ORIF in 2004 (A.R. at 18). *See* 20 C.F.R. §§ 404.1520(c) and 416.920(c). The ALJ found that the following conditions were not severe: (1) hypertension, which was "well-controlled on medication;" (2) type II diabetes, which was "capable of being controlled with lifestyle modification;" (3) GERD, which was also adequately controlled with medication; (4) OSA; and (5) the medically determinable mental impairments of a mood disorder, a personality disorder, and alcohol substance addiction disorder, considered singly or in combination (A.R. at 18-19).

For this latter determination, the ALJ relied on the assessment of Plaintiff by Dr. Langer, the

DDS medical consultant (*id.* at 18-19, 102).  After applying the four broad functional areas

(paragraph B criteria) described in the regulations to determine the severity of Plaintiff's mental

impairments, the ALJ determined  that Plaintiff's limitations in the areas of daily living, social

functioning, and "concentration, persistence or pace" were mild and that Plaintiff did not

experience any episodes of decompensation (*id.* at 19).  The ALJ concluded that Plaintiff's

mental impairments would not limit his ability to perform basic mental work activities and, thus,

were non-severe for purposes of assessment at steps two and three of the sequential evaluation

process (*id*. at 18-19). *See* 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[6]

     At step three, the ALJ concluded that Plaintiff's severe impairments -- obesity and the

condition of his left knee and lower leg -- either alone or in combination, did not meet or

medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (A.R. at 19).  Before proceeding to step four, the ALJ determined that Plaintiff had

the RFC to perform light work,[7] with the following additional limitations:

> stand[ing]/walk[ing] for four hours in an 8 hour workday; occasional stooping,
> crouching, crawling, climbing; needs a cane to ambulate uneven surfaces; can walk 50
> yards; no cold, hazards, heights or dangerous machinery; simple tasks, unskilled work[8]
> with few work changes.

---

[6] The ALJ recognized that the RFC used at steps four and five of the sequential evaluation
process requires a more detailed assessment (A.R. at 19).
[7] The Social Security Administration ("SSA") defines light work as that which "involves lifting
no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10
pounds.  Even though the weight lifted may be very little, a job is in this category when it
requires a good deal of walking or standing, or when it involves sitting most of the time with
some pushing and pulling of arm or leg controls.  To be considered capable of performing light
work, [a claimant] must have the ability to do substantially all of these activities.  If someone can
do light work, [the SSA] determine[s] that he or she can do sedentary work, unless there are
additional limiting factors such as loss of fine dexterity or inability to sit for long periods of
time." 20 C.F.R. § 404.1567.
[8] "The commissioner has defined competitive, remunerative 'unskilled work' as generally
entailing the ability to (i) understand, remember, and carry out simple instructions, (ii) make

(*id*. at 19).

At step four, the ALJ found that Plaintiff was not able to perform any past relevant work (*id*. at 24).  *See* 20 C.F.R. §§ 404.2565 and 416.965.  Finally, at step five, the ALJ determined, based on the testimony of the VE, that Plaintiff can perform jobs that exist in significant numbers in the national economy taking into account Plaintiff's age, education, work experience, and RFC, and, therefore, Plaintiff was not disabled  (A.R. at 24-25).

G.    Plaintiff's objections

Plaintiff argues that there is no substantial evidence to support the ALJ's determination that he is not disabled.  Specifically, Plaintiff claims that the ALJ failed to:  (1) give controlling weight to the June 19, 2013 RFC questionnaire completed by Dr. Sakurai, Plaintiff's PCP since 2009 (Dkt. No. 19); (2) correctly evaluate Plaintiff's non-exertional impairments, specifically diabetes, hypertension, and sleep apnea, in determining his RFC (*id*.); and (3) adequately consider Plaintiff's ability to cope with the stress of employment due to Plaintiff's identified mental impairments (*id*.).  Plaintiff's contentions will be addressed in turn.

1.    Dr. Sakurai's opinion

a.    June 3, 2011 to October 16, 2012

Plaintiff relies on his pre-surgery medical reports, which are part of the record, to support his argument that the ALJ erred by failing to afford controlling weight to Dr. Sakurai's RFC opinion (Dkt. No. 19 at 4-12).  The initial question is whether, in light of the first ALJ's

---

simple work-related decisions, (iii) respond appropriately to supervision, coworkers, and usual work situations, and (iv) deal with routine changes in a routine work setting."  *Hayes v. Astrue*, No. 2:10-CV-42-DBH, 2010 WL 5348757, at *3 (D. Me. Dec. 20, 2010)(citing SSR 96-9p, 1996 WL 374185, at *9 (July 2, 1996)).

grant of Plaintiff's application, which established a closed period of disability from October 1,

2008 to June 2, 2011 mainly due to Plaintiff's "intractable and severe" left leg pain, which

Plaintiff anticipated would be alleviated by impending surgery, substantial evidence supports the

current ALJ's seemingly contradictory determination that Plaintiff was not disabled on June 3,

2011, the very next day (A.R. at 120-21).  Although Plaintiff acknowledged medical

improvement as of June 2, 2011 at the hearing before the first ALJ in 2011 (*id.* at 23, 41),

Plaintiff made this representation with the understanding that he soon would undergo surgery for

the removal of hardware in his leg, which he believed was the source of the pain (*id*. at 41-42).

But Plaintiff's surgery was not performed until October 16, 2012 (*id*. at 476).  The medical

reports of Dr. Sakurai and NEOS for the period before June 3, 2011 and up to October 16, 2012,

which were submitted to support Plaintiff's present claim, indicate that Plaintiff consistently had

difficulty walking, and complained of pain in his left knee, lower leg, and ankle (*id*. at 298, 301,

319, 322, 327).  Because the first ALJ found that Plaintiff was disabled until June 2, 2011, and

because the current ALJ found that Plaintiff was not under a disability within the meaning of the

Act as of the next day, remand is necessary to reconcile the apparently contradictory findings (*id*.

at 16).

　　　In examining whether to terminate benefits after a closed period of disability, an ALJ is

required to determine whether "'a claimant has improved to the point of being able to engage in

substantial gainful activity' or if his . . . 'condition is not as serious as first supposed.'"  *Dedis v.

Chater*, 956 F. Supp. 45, 48-49 (D. Mass. 1997) (quoting *Miranda v. Sec'y of Health, Educ. &

and Welfare*, 514 F.2d 996, 998 (1st Cir. 1975)); *see also Pelosi v. Comm'r of Soc. Sec.*, Civil

Action No. 12-40111-TSH, 2015 WL 4585770, at * 2 (D. Mass. Jul. 30, 2015) (citing 20 C.F.R.

§ 404.1594(a)) ("[U]nder the Act, benefits may be discontinued only if there is substantial

evidence to support a finding: (1) that there is medical improvement related to the individual's ability to work, and (2) that the individual is now able to engage in substantial gainful activity"). *Compare Shepherd v. Apfel,* 184 F.3d 1196, 1199-1202 (10th Cir. 1999) (applying the "medical improvement" standard to a period following a finding of a closed period of disability); *Drummond v. Comm'r. of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997)) ("Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ"); *Tempesta v. Astrue*, No. CV-08-00003(FB), 2009 WL 211362, at *8-*9 (E.D.N.Y. Jan. 28, 2009) (where claimant was awarded benefits for a closed period, the ALJ was required to explain medical improvement in claimant's physical condition to support the denial of benefits for a subsequent period); 20 C.F.R. § 404.1594(b)(1) (SSA's definition of the medical improvement standard). Here, the ALJ's conclusion that Plaintiff was not disabled between June 3, 2011 and October 16, 2012, when Plaintiff had surgery, was based exclusively on Plaintiff's representation to the first ALJ that he expected his condition to improve following imminent surgery (A.R. at 23). That surgery, however, did not take place until October 16, 2012 (*id.* at 476). On remand, the ALJ should determine and explain whether substantial evidence supports his implicit finding of Plaintiff's medical improvement as of June 3, 2011. *Compare Martin v. Astrue*, Civil Action No. 5:05-00947, 2008 WL 1913882, at *8 (S.D. W.Va. April 28, 2008) (remanding the first ALJ's denial of benefits where a different ALJ found that claimant was disabled on the day after the first ALJ issued his decision).

>           b.      After October 16, 2012

As noted above, Plaintiff had surgery to remove some hardware from his left lower leg on October 16, 2012 (A.R. at 476). As a result, the analysis of Plaintiff's complaint -- that the ALJ failed to give controlling weight to Dr. Sakurai's post-surgery RFC opinion -- is distinct from

consideration of the ALJ's decision for the period prior to surgery.  Plaintiff asserts that Dr.

Sakurai's RFC assessment should be given controlling weight because of his "longitudinal

history" with Plaintiff (Dkt. No. 19 at 14).  Plaintiff further disputes the ALJ's finding that Dr.

Sakurai's assessment is inconsistent with other medical evidence (*id*. at 13-14).

An ALJ must ordinarily "give more weight to the opinions from [the claimant's] treating

physicians, since these sources are likely to be the medical professionals most able to provide a

detailed, longitudinal picture of [the claimant's] medical impairments."  20 C.F.R. §

416.927(c)(2).  A treating physician's opinion, however, is only controlling if it "is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence."  *Id*.  If the treating physician's opinion is

inconsistent with other evidence in the record, the conflict is for the ALJ, not the court, to

resolve.  *See Rodriguez*, 647 F.2d at 222.  The ALJ's decision must nevertheless "contain specific

reasons for the weight given to the treating source's medical opinion, supported by the evidence

in the case record . . . ."  SSR 96-2p, 1996 WL 374188 at *5 (July 2, 1996); *see also Healy v.*

*Colvin*, Civil Action No. 12-30205-DJC, 2014 WL 1271698, at *13-15 (D. Mass. Mar. 27,

2014).  "If the ALJ determines that the treating physician's opinion is not entitled to controlling

weight, the ALJ must determine the amount of weight to which the opinion is entitled based on

the following six factors:  (1) '[l]ength of treatment relationship and the frequency of

examination,' (2) '[n]ature and extent of the treatment relationship,' (3) '[s]upportability' of  the

medical opinion, (4) consistency of the opinion  'with the record as a whole,' (5) '[s]pecialization'

of the treating source, and (6) 'other factors . . . that tend to support or contradict the opinion.'"

*Healy*, 2014 WL 1271698, at *14 (quoting 20 C.F.R. § 404 .1527(c)).  Ultimately, the ALJ is

required to supply good reasons for the weight that he assigns to the treating source.  *See id*.

Here, "the ALJ did not reject the assessment[] of [Dr. Sakurai] outright." *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 71 (D. Mass. 2014) (citing *Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 276 (1st Cir. 1988)). The ALJ adopted Dr. Sakurai's identification of Plaintiff's primary limitations on walking and standing in his RFC (A.R. at 19, 490, 491). Both Dr. Sakurai's and the ALJ's RFCs restrict Plaintiff's standing to less than four hours and his walking to less than 50 yards (150 feet) (*id.* at 19, 492). Dr. Sakurai opined that Plaintiff had no limitations with respect to sitting or to using his hands for repetitive hand motions, pushing, or pulling, which made him capable of performing sedentary work (*id.*). *See* 20 C.F.R. § 404.1567. The ALJ's stated reason for giving "little weight" to Dr. Sakurai's conclusion of disability was that Dr. Sakurai's assessment was inconsistent with other substantial evidence, specifically Dr. Sakurai's treatment notes, which "do not show specific signs and findings regarding the left leg impairment," the reports of NEOS, including those of the specialist Dr. Brecht, Plaintiff's treating orthopedic surgeon, and the DDS medical consultants' assessments (A.R. at 20-24). The ALJ correctly assessed Dr. Sakurai's medical records as being inconsistent with Dr. Sakurai's RFC (*id*. at 23). Dr. Sakurai's treatment notes after the surgery documented that Plaintiff's gait was antalgic and that he used a cane, but that he was "full weight bearing" (*id*. at 23, 469). While Dr. Sakurai's records reflect Plaintiff's reports of pain in his left leg, Dr. Sakurai did not treat Plaintiff's leg. Instead, Plaintiff's leg was treated by Dr. Brecht (*id.* at 305-06, 400-06, 476-80). Dr. Brecht's records from March 2013 indicate that Plaintiff had good strength in his leg with no sign of instability (*id*. at 22, 476). An x-ray showed that the ankle and knee joints were unremarkable and that the tibia fracture was healed (*id.* at 22, 476, 468). *See Healy*, 2014 WL 1271698, at *15 ("The ALJ discussed a multitude of [the PCP's] notes throughout her written decision, but placed little weight o[n] the physician's . . . RFC assessment because it was

inconsistent with . . . physician notes regarding [claimant's] limitations").  The ALJ's opinion was also supported by the opinions of the DDS experts, who determined that Plaintiff could stand or walk for up to four hours (*id.* at 23-24, 79-81, 101).  The treating orthopedic surgeon's records provided an appropriate basis for assigning greater weight to the DDS physicians' opinions than to those of Dr. Sakurai.  *See Ormon v. Astrue*, 793 F. Supp. 2d 465, 473 (D. Mass. 2011) (citing *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991)) ("Where reviewing experts provide an opinion that is contrary to that of the treating physician, the ALJ may assign greater weight to the opinion of a reviewing physician so long as he has an adequate basis for doing so").  This evidence corroborated the ALJ's conclusion that, after October 2012, Plaintiff had the ability to perform light work with limitations on standing and walking (A.R. at 19, 24-25).

The court concludes that the ALJ provided an adequate explanation for according Dr. Sakurai's decision "little weight," and finds no error.

It is also clear from the opinion that the ALJ considered the appropriate factors in evaluating the limiting effects, if any, of Plaintiff's complaints of pain.  "When a claim of disability is based on a subjective symptom, such as pain, a two-step analysis is conducted." *Dasilva-Santos v. Astrue*, 596 F. Supp. 2d. 181, 192 (D. Mass. 2009).  In determining Plaintiff's RFC, the ALJ first considered all of Plaintiff's symptoms to the extent that they were consistent with the objective medical evidence and determined that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms" (A.R. at 20, 23).  20 C.F.R. §§ 404.1567(b) and 416.929.

> Once it is found that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ must evaluate evidence of the intensity and persistence of the symptoms, including statements from the claimant.  20 C.F.R. § 404.1529(c)(1); 416.929(c)(1).  However, a claimant's subjective

24

> description of symptoms alone cannot establish disability; the ALJ must also consider
> any other available evidence, including the objective medical evidence, to determine
> whether the claimant's testimony is consistent with the remainder of the record.  20
> C.F.R. §§ 404.1529(a), (c); 416.929(a), (c).

*Bourinot v. Colvin*, 95 F. Supp. 3d 161, 180 (D. Mass. 2015).  The ALJ was then required to

make a finding about the credibility of Plaintiff's statements about the limitations caused by his

pain.  *See Masse v. Comm'r of Soc. Sec.,* No. CA 10-134 M, 2011 WL 2791283, at *6 (D.R.I.

June 24, 2011); SSR 96–7p, 1996 WL 374186, at *1 (July 2, 1996).  The ALJ's credibility

determination "is entitled to deference, especially when supported by specific findings."

*Frustaglia v. Sec'y of Health & Human Servs.,* 829 F.2d 192, 195 (1st Cir. 1987).

      Substantial evidence supports the ALJ's finding that Plaintiff's statements about the

intensity of his post-surgical pain, including his rating it as "10" on a scale of 10, were "not

entirely credible, as they are not supported by the medical record to the extent alleged"  (A.R. at

20, 24).  "[T]he ALJ's explanation for finding a claimant less than fully credible need only be

'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight

the adjudicator gave to the individual's statements and the reason for that weight.'"  *Traynham v.

Astrue*, 925 F. Supp. 2d 149, 158 (D. Mass. 2013)(quoting SSR 96-7p, 1996 WL 374186, at *4).

Plaintiff's testimony was inconsistent with the medical records.  After the surgery, Dr. Brecht

recorded that Plaintiff was not in apparent distress (A.R. at 476).  Dr. Brecht opined that the

remaining broken screw and tibial nail would not cause discomfort to the extent that narcotics

were required to relieve Plaintiff's pain (*id*. at 22, 476-77).  Plaintiff's articulation of the severity

of his pain was further undercut by the fact that Plaintiff abused cocaine, purchased Percocet

from friends, and sought Percocet from the emergency room after Dr. Sakurai refused to

prescribe it (*id*. at 22, 23, 43, 442, 456, 471, 505, 507, 508).  The ALJ reasonably inferred, based

upon the record evidence, that Plaintiff exaggerated the intensity of his pain in order to obtain

narcotics (*id.* at 23).  These credibility determinations and inferences were within the ALJ's

exclusive purview.  *See Irlanda Ortiz,* 955 F.2d at 769*; Parkins ex rel. Parkins v. Astrue*, No.

4:08CV3206, 2009 WL 3756564 (D. Neb. Nov. 5, 2009) (ALJ inferred that plaintiff was

motivated to exaggerate symptoms because he was addicted to narcotics and "'to get disability

for his back'").  Plaintiff's testimony regarding the intensity of his pain was further discredited by

his acknowledgement, during the hearing before the first ALJ, that surgery would result in

medical improvement and that he would be able to perform light or sedentary employment

following surgery (A.R. at 23, 119, 120-121).

The ALJ's credibility determination was supported by substantial evidence, and provides

no basis for remand or reversal as to the period following October 16, 2012.

### 2.    Non-exertional impairments

Nor did the ALJ err by failing to consider Plaintiff's non-exertional impairments –

specifically type II diabetes mellitus, hypertension, and OSA – when determining Plaintiff's

RFC.  The ALJ "evaluated all of the evidence of these physical conditions and determined,

within [his] authority, that they did not rise to the level of a 'severe' impairment.  20 C.F.R. §§

404.1520(c), 416.920(c)."  *Healy,* 2014 WL 1271698, at *9.  "A mere diagnosis is insufficient to

establish that an impairment is severe[,] as defined by the regulations."  *Church v. Astrue,* Civil

Action No. 10–cv–30236–FDS, 2012 WL 369424, at *8 (D. Mass. Feb. 2, 2012) (citing 42

U.S.C. § 423(d)(2)(B)).  "An impairment or combination of impairments is 'severe' if it

significantly limits an individual's physical or mental ability to perform basic work activities,

which in turn is defined as 'the abilities and aptitudes necessary to do most jobs.'"  *Church,* 2012

WL 369424, at *8 (quoting 20 C.F.R. §§ 404.1520(c), 1521(b)).  "The claimant must prove the

existence of a physical or mental impairment by providing medical evidence consisting of signs,

symptoms, and laboratory findings; the claimant's own statement of symptoms alone will not

suffice." *Id.* (citing 20 C.F.R. §§ 404.1508, 416.908); *Grady v. Astrue,* 894 F. Supp. 2d 131, 142

(D. Mass. 2012) ("A plaintiff's description of symptoms and limitations cannot by itself establish

disability; the ALJ must also consider objective medical evidence and any other available

evidence, such as medications and daily activities, to determine whether the plaintiff's testimony

is consistent with the remainder of the record").  "The ALJ has discretion to determine whether

an impairment is severe, so long as []he demonstrates that []he reviewed the entire medical

record and has 'substantial evidence' to support [his] finding." *Healy,* 2014 WL 127698, at *9.

*See Noel v. Astrue,* C.A. No. 11–cv–30037–MAP, 2012 WL 2862141, at *6 (D. Mass. July 10,

2012).

"Even if an ALJ overlooks some single piece of evidence, the error will be deemed

harmless so long as the ALJ has 'explicitly considered "all symptoms," both severe and

nonsevere, in assessing Plaintiff's residual functional capacity and there is no indication that the

ALJ failed to consider the cumulative effect of these impairments.'" *Healy,* 2014 WL 1271698,

at *9 (quoting *Perez v. Astrue,* Civil Action No. 11-cv-30074–KPN, 2011 WL 6132547, at *4

(D. Mass. Dec. 7, 2011)) (finding failure to analyze arthritis a harmless error where ALJ had

reviewed all relevant symptoms and determined other severe impairments existed).  "The ALJ

sufficiently reviewed the medical evidence regarding all of [Plaintiff's] alleged symptoms" and

his conclusion that Plaintiff was not severely impaired by diabetes, hypertension, or OSA was

supported by substantial evidence. *Healy,* 2014 WL 1271698, at *9.  "The ALJ recognized that

[Plaintiff] had been diagnosed with each of these three conditions at some point, but reasonably

relied on substantial evidence that these diagnoses did not prevent [Plaintiff] from being mobile

or functional" (*id.* at 18). *Id.*  While Plaintiff points to several parts of the record where Dr.

Sakurai diagnosed these conditions, there is no evidence to support Plaintiff's contention that any of these three conditions substantially impaired him to the extent to warrant recognition as severe at step two. *See id.* "The [c]ourt concludes that the ALJ gave [these] medical conditions appropriate consideration, proportionate to their presence in the record and their overall impact on [Plaintiff's] work ability." *Id.*

"'If an impairment can be controlled by treatment or medication, it cannot be considered disabling.'" *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (quoting *Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993)). *See also* 20 C.F.R. §§ 404.1530(b), 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled"). The ALJ's conclusion – that Plaintiff's conditions were controlled by medical intervention – is supported by the medical evidence (A.R. at 18). The ALJ noted Plaintiff's diagnosis of OSA in his discussion of Dr. Sakurai's medical records of June 30, 3011 (*id.* at 20). Plaintiff highlights the fact that the ALJ indicated that that the sleep study "did not recommend a CPAP machine," when, in fact, Plaintiff was directed to use a CPAP machine (Docket No. 19 at 14; A.R. at 20, 430, 465, 466). But this discrepancy is inconsequential because Plaintiff fails to point to any record evidence to buttress his contention that OSA limited his ability to "perform basic work activities." *Church*, 2012 WL 369242, at *8. In fact, Dr. Sakurai's records, which show that Plaintiff's OSA was "mild" and that he used a CPAP machine, support the ALJ's conclusion that Plaintiff's OSA was not a factor that limited his ability to perform light work (A.R. at 18, 430-31, 460, 465, 466).

Likewise, although the ALJ considered Plaintiff's diabetes and hypertension, he reasonably concluded, based on specifically referenced medical evidence, that these conditions could be controlled by medication and lifestyle changes, and, thus, were not severe (*id*. at 18). Plaintiff points to other record evidence to support his argument that these conditions were

28

uncontrolled (Dkt. No. 19 at 15).  But the ALJ's contrary determination is well supported.  "[T]he resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the ALJ], not for the doctors or for the courts."  *Rodriguez*, 647 F.2d at 222.  Dr. Sakurai recorded that Plaintiff's diabetes was "[u]ncontrolled" in July 2012 (A.R. at 460).  Yet, two months later, Plaintiff's HgbA1C had improved due to changes in his diet and adherence to his prescribed medication (*id*. at 466).  Plaintiff's diabetes was well-controlled in March 2013 (*id.* at 470).  Like Plaintiff's diabetes, his hypertension was subject to fluctuation due to his failure to modify his lifestyle and to use his medication as prescribed.  The records that Plaintiff points to in his motion reflect Plaintiff's hypertension during periods when it was "suboptimal" (Dkt. No. 19 at 15; A.R. at 449, 451, 454, 459, 460, 465-466).  But these records conflict with the substantial medical evidence upon which the ALJ relied, which indicated that Plaintiff's uncontrolled hypertension was due to his lack of compliance with the physician's recommended treatment without "an acceptable reason" (*id.* at 23).  20 C.M.R. § 404.1530(c).  The medical records are replete with references to Plaintiff's inconsistent medication management (A.R. at 389, 390, 392, 453, 454, 466, 470).  In September 2012, Plaintiff's blood pressure was "usually within acceptable range," which supports the ALJ's determination that it could be controlled (*id.* at 22, 389, 465).

The ALJ gave appropriate consideration to Plaintiff's OSA, diabetes, and hypertension. Plaintiff has not met his burden of demonstrating that the ALJ erred by excluding the symptoms associated with these medical conditions when he crafted Plaintiff's RFC.

### 3.      Mental impairment

Lastly, Plaintiff contends that the ALJ erred by failing to afford controlling weight to Dr. Sakurai's and Ms. Ramírez's opinions of Plaintiff's mental health.  Dr. Sakurai diagnosed

Plaintiff as having a mood disorder and substance abuse and that his "poor coping skills,"

"bipolar disorder," and "problems with impulse control" limited his ability to deal with ordinary

work stress  (*id*. at 490, 491).  Ms. Ramirez, Plaintiff's therapist, reported that Plaintiff suffered

from panic attacks with agoraphobia and depressive disorder and that he was unable to cope with

normal work stress (*id*. at 496).  Plaintiff faults the ALJ for omitting from the RFC Plaintiff's

impaired ability to deal with normal work pressure, as diagnosed by his treating sources, Dr.

Sakurai and Ms. Ramírez.

"A treating source is defined by 20 C.F.R. §§ 404.1502, 416.902 as a patient's own

physician, psychologist, or other acceptable medical source who has provided medical treatment

in an ongoing way."  *Gagnon v. Astrue*, Civil Action No. 1:11-CV-10481-PBS, 2012 WL

1065837, at *5 (D. Mass. Mar. 27, 2012).  As explained above, "[w]hile the medical opinion of a

treating source is generally afforded more weight than that of a non-treating source, an ALJ may

properly give less weight to a medical opinion that is inconsistent with the record as a whole or

unsubstantiated by treatments notes."  *Hargrow v. Colvin*, Civil Action No. 13-10170-DJC, 2014

WL 1153782, at *13 (D. Mass. Mar. 19, 2014) (citing 20 C.F.R. § 404.1527(c)).  Moreover,

> [a] therapist is not among the "acceptable medical sources" listed in the Social Security
> Regulations, *see* 20 C.F.R. §§ 404.1513(a), 416.913(a), and an ALJ is granted wide
> discretion in weighing a therapist's opinion.  *See* SSR 06–03p, 2006 WL 2329939 (Aug.
> 9, 2006).  A therapist's opinion does not deserve "controlling weight" but may be useful
> "to show the severity of the individual's impairment(s) and how it affects the individual's
> ability to function." *Alcantara v. Astrue,* 257 Fed. Appx. 333, 334–35 (1st Cir. 2007)
> [unpublished].  When deciding how much weight to give a therapist's opinion, an ALJ is
> only constrained by the duty to reach a conclusion supported by substantial evidence in
> the record.  *See* 20 C.F.R. § 416.927(d)(2) (stating that if a medical source opinion is
> inconsistent with the administrative record, it should be afforded less weight).

*Gagnon,* 2012 WL 1065837, at *5.  The amount of weight given to a therapist's opinion is based

on factors listed in 20 C.F.R. § 404.1527(d).  "The factors that an ALJ may use to evaluate the

opinion of an 'other [medical] source' are (1) how long the source has known the individual and

how frequently the source has examined the individual; (2) how consistent the opinion is with

other evidence; (3) the degree to which the source presents relevant evidence to support an

opinion; (4) how well the source explains the opinion; (5) the source's specialty or area of

expertise; and (6) any other factors, such as the source's understanding of the agency's disability

programs and evidentiary requirements." *Nadeau v. Colvin*, Civil Action No. 14-10160-FDS,

2015 WL 1308916, at *8 n. 10 (D. Mass. Mar. 24, 2015).  *See* SSR 06–03p, 2006 WL 2329939,

at *4–5.

Because the ALJ found that Ms. Ramírez was not an "acceptable medical source"

pursuant to 20 C.F.R. §§ 404.1513(a), 416.913(a), he afforded Ms. Ramírez's opinion "little

weight" (A.R. at 23).  The ALJ's decision was undergirded by Plaintiff's history of sporadic

treatment by Ms. Ramírez, which resulted in a paucity of treatment records, and by the

contradiction between Ms. Ramírez's opinion and her GAF scores, which were "in the moderate

range" (*id.* at 23).  Ms. Ramírez began treating Plaintiff in June 2009, but the record evidence

shows few visits between that date and April 2013 when, according to Dr. Sakurai, City Clinic

terminated Plaintiff's treatment because of "no-shows" (*id*. at 352, 357, 362, 369, 371, 375, 417,

421, 471).  Dr. Sakurai's and Ms. Ramírez's treatment notes, which indicate that Plaintiff had

missed appointments, corroborated the ALJ's assessment (*id*. at 316, 355-56, 462).  This

evidence discredited Plaintiff's hearing testimony that he was seeing Ms. Ramírez two to three

times per month for treatment of his depression and anxiety (*id*. at 44-45).  The ALJ further

discounted Ms. Ramírez's opinion because he concluded that she did "not have accurate

information" from Plaintiff regarding his drug abuse (*id.* at 23).  Although Ms. Ramírez's

assessment did not include a diagnosis of alcohol or substance abuse, Dr. Sakurai drew that

conclusion, based on Plaintiff's two urine screens, which were positive for cocaine, and

Plaintiff's opiate seeking behavior (*id.* at 456, 467, 471, 490, 505).

The "moderate range" GAF scores that Ms. Ramírez assigned to Plaintiff contradicted her

assessment that he was unable to cope with the stress of a job, as the ALJ noted (*id.* at 23).   At

the time of Ms. Ramírez's assessment in June 2013, she assigned a GAF score of 55 (*id.* at 496,

501).  In 2010, 2011, and 2012, his GAF scores ranged between 50 and 60, with 55 and 57 being

his most consistent scores (*id.* at 357-360, 362, 369, 378, 417).  "A GAF score represents 'the

clinician's judgment of the individual's overall level of functioning.  The GAF score is taken

from the GAF scale, which 'is to be rated with respect only to psychological, social, and

occupational functioning.'"  *Dietz v. Astrue,* Civil Action No. 08–30123-KPN, 2009 WL

1532348, at *6 n. 4 (D. Mass. May 29, 2009) (quoting *Munson v. Barnhart*, 217 F. Supp. 2d 162,

164 n. 2 (D. Me. 2002), quoting DSM–IV–TR at 32, 34 (appendix)).  "[GAF] scores may be of

help in assessing functional ability, although they are not determinative."  *Dietz,* 2009 WL

1532348, at *6.  "A GAF score between 51 and 60 [such as Plaintiff's] is consistent with

moderate symptoms and 'moderate difficulty in social, occupational, or school functioning.'"

*Gagnon,* 2012 WL 1065837, at *5 (quoting *American Psychiatric Association, Diagnostic &*

*Statistical Manual of Mental Disorders* 31 (4th ed. 1994)).  The ALJ correctly concluded that

Plaintiff's GAF scores did not support Ms. Ramírez's opinion that Plaintiff's was unable to

function in a workplace.

While Plaintiff's GAF scores, alone, may not be determinative, when they are viewed in

conjunction with the record as a whole, the ALJ's decision to give little weight to Ms. Ramirez's

opinion of Plaintiff's functional ability, and, instead, to adopt the opinion of the DDS reviewer,

Dr. Langer, is supported by substantial evidence (A.R. at 19).[9]  *See Monroe v. Barnhart*, 471 F.

Supp. 2d 203, 211 (D. Mass. 2007).  Dr. Langer found Plaintiff's impairments of a personality

disorder, alcohol and substance addiction disorder, and an affective disorder to be non-severe

(A.R. at 19, 102).  This finding was in accord with the other record evidence, including Ms.

Ramírez's GAF scores, Plaintiff's history of missing appointments at City Clinic, and Plaintiff's

failure to adhere to the medication that Dr. Sakurai prescribed for depression and anxiety (*id.* at

313, 357-60, 362, 369, 378, 417, 452, 453, 471, 496, 501).[10]  *See Roth,* 45 F.3d at 282.

---

[9] Dr. Gambill, the first DDS consultant, completed a PRT assessment and a PRTF prior to Dr. Langer's assessment (A.R. at 67).  Dr. Gambill determined that Plaintiff's personality disorders, alcohol and substance abuse disorders, and affective disorders were non-severe (*id.* at 66-67). Dr. Gambill's PRT assessment of paragraph B criteria found that Plaintiff had mild restrictions on activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace (*id.* at 67).  Plaintiff did not experience any repeated episodes of decompensation of an extended duration (*id.*).  In order to make a showing that Plaintiff met the paragraph B criteria necessary for a finding of a "severe" mental disorder, he was required to establish that his condition resulted in at least two of the following:  "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04 and 12.06.  *See Escobar v. Colvin*, Civil Action No. 13-10186-JGD, 2014 WL 1159822, at *11 (D. Mass. Mar. 20, 2014).  "The rating 'marked' is applied using a 'five point scale:  none, mild, moderate, marked and extreme.'"  *Dias*, 52 F. Supp. 3d at 279 (quoting 20 C.F.R. § 416.920a(c)).

[10] As Plaintiff's PCP, Dr. Sakurai was not a mental health expert, and the ALJ was entitled to reject Dr. Sakurai's assessment that Plaintiff suffered from bipolar disorder (A.R. at 23). "Physicians, with the exception of those specializing in psychiatry, are totally unqualified to diagnose psychological disorders." *Schuelke v. Comm'r of Soc. Sec.*, Civil Action No. 11-519, 2012 WL 1657530, at *9 (W.D. Pa. May 10, 2012) (quoting *Ross v. Shalala,* 865 F. Supp. 286, 292 (W.D. Pa. 1994)).  In addition, the ALJ's minimization of Dr. Sakurai's diagnoses of depression and anxiety and his assessment of Plaintiff's poor ability to cope with workplace stress was supported by the same substantial evidence that grounded the ALJ's decision to afford Ms. Ramírez's opinion little weight.  *See Torres v. Barnhart*, 249 F. Supp. 2d 83, 97 (D. Mass. 2003) ("[J]ust because claimant suffers from depression and anxiety simply does not mean, *a fortiori*, that []he has 'any impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities'")(citation omitted).

Despite Dr. Langer's finding of non-severe medical impairments, the ALJ considered Plaintiff's difficulty coping with workplace stress at steps four and five of the sequential evaluation process (A.R. at 19, 102).  In conformity with SSR 96-8p, 1996 WL 374184, at *4, the ALJ incorporated a restriction into the RFC to reflect this mental impairment:  "simple tasks and unskilled work with few work changes" (A.R. at 19).  The ALJ further found that his decision -- that Plaintiff was not disabled due to his RFC to perform light work -- would not have changed if Plaintiff's psychological impairments had been severe (*id.* at 25).  *See* 20 C.F.R. 404.1520a; *see also* SSR 85-15, 1985 WL 56857, at *4 (1985).  Because the ALJ included Plaintiff's inability to cope with workplace stressors in the RFC, the distinction between severe and non-severe mental impairments is inconsequential.  *Compare Vining v. Astrue,* 720 F. Supp. 2d 126, 132 (D. Me. 2010) (because ALJ adopted an RFC assessment accounting for claimant's condition, there was no error in failure to find that condition severe at step two of the sequential evaluation).

Contrary to Plaintiff's claim, the ALJ included Plaintiff's mental impairments in the hypotheticals that he posed to the VE.  "The opinion of a vocational expert that a Social Security claimant can perform certain jobs qualifies as substantial evidence at the fifth step of the analysis" as long as the opinion is "in response to a hypothetical that accurately describes the claimant's limitations."  *Sousa v. Astrue,* 783 F. Supp. 2d 226, 235 (D. Mass. 2011).  The ALJ specifically asked the VE whether his opinion of the availability of jobs would change if the limitations of "simple, routine tasks, unskilled tasks [with] simple work-related decisions with few workplace changes" were added to the hypothetical (A.R. at 55).  The VE indicated that his opinion regarding the availability of light and sedentary unskilled jobs remained unchanged; that is, jobs were available in the national and regional economies (*id.* at 55).  Here, the VE's opinion

that an individual with Plaintiff's limitations could perform certain unskilled jobs was based on a hypothetical question that incorporated Plaintiff's mild difficulties in coping with workplace stress, which were reflected in the ALJ's mental RFC (*id*. at 19-25).  "Because the RFC was supported by substantial evidence, the VE's testimony, and the ALJ's reliance on it, were proper." *Price v. Astrue*, Civil Action No. 11-11207-JGD, 2012 WL 4571752, at *9 (D. Mass. Sept. 28, 2012).

      V.    <u>Conclusion</u>

For the reasons stated above, Plaintiff's motion for an order reversing the Commissioner's decision (Dkt. No. 18) is ALLOWED, in part, and, for the reasons detailed herein, the case is remanded for the Commissioner to explain whether medical improvement occurred during the period from June 3, 2011 to October 16, 2012.  As for the period after October 16, 2012, the Commissioner's motion to affirm the decision (Dkt. No. 23) is GRANTED.

It is so ordered.

Dated:  February 26, 2015

          /s/ Katherine A. Robertson
          KATHERINE A. ROBERTSON
          United States Magistrate Judge